Filed 5/21/15  P. v. Alvarado CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ANDRES ALVARADO, Defendant and Appellant. | D064792 (Super. Ct. No. SCD245082) |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed as modified.

Buckley & Buckley and Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Peter Quon, Jr. and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Andres Alvarado of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count 1), and battery with serious bodily injury (Pen. Code, § 243, subd. (d); count 3). As to both counts it found true allegations that Alvarado personally inflicted great bodily injury on the victim within the meaning of Penal Code section 1192.7, subdivision (c)(8), and as to count 1, within the meaning of Penal Code section 12022.7, subdivision (a). Alvarado waived a jury trial and admitted he had suffered two prior convictions that qualified as probation denial priors (Pen. Code, § 1203, subd. (e)(5)), one of which also qualified as a strike (Pen. Code, §§ 667, subd. (b)-(i), 668, 1170.12) and serious felony (Pen. Code, §§ 667, subd. (a), 668, 1192.7, subd. (c)). The trial court sentenced Alvarado to 14 years in state prison, consisting of six years (double the midterm) and three years for the great bodily injury enhancement on count 1, and five years for the serious felony prior conviction. The court stayed Alvarado's sentence on count 3. (Pen. Code, § 654.)

Alvarado contends the trial court prejudicially erred by dismissing a juror during the deliberations because the record does not establish as a demonstrable reality that she was unable to properly deliberate. He further contends the court erred by denying his postconviction motions regarding the validity of his prior convictions and to discharge his retained counsel, and by permitting him to represent himself without a full hearing under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). Alvarado finally contends the trial court incorrectly calculated his actual period of presentence custody, requiring that his credits be corrected. The People concede the latter point, and we will modify the

2

judgment to correct Alvarado's credits accordingly. Otherwise, we conclude the trial court's finding of good cause to dismiss the juror is supported to a demonstrable reality so that her discharge did not violate Alvarado's statutory or constitutional rights. We further conclude the trial court did not err, violate Alvarado's Sixth Amendment rights, or otherwise deprive Alvarado of assistance of counsel in denying his postconviction motions. Accordingly, as modified, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Alvarado does not advance a sufficiency of the evidence challenge, so we briefly summarize the acts underlying his convictions.

In December 2012, Alvarado and his codefendant at trial, Geramy Nicholas Moore, were involved in a brawl with four or five other men in San Diego's Gaslamp area. A witness driving in the area recorded the fight on his cellular telephone, and he, as well as others involved in the fight, observed Moore punch the victim, and Alvarado kick the victim several times in the face while the victim was on the ground.

In Alvarado's defense, one of the men with Moore and Alvarado that night testified he got into an argument with other men who started to approach him, after which he became scared and panicked, and asked his friends to help him. He testified Moore and Alvarado were just there to defend him. He did not see Alvarado hit or kick anyone.

DISCUSSION

I. *Dismissal of Juror No. 3*

Defendant contends the trial court erred by dismissing one of the jurors, Juror No. 3, after she reported having an encounter with codefendant Moore outside the courthouse

3

at the end of the first day of deliberations. He maintains the court used the wrong standard in assessing whether the juror could deliberate and failed to properly analyze whether there was a legal basis for excusal. He argues the court's conclusion that the juror could no longer deliberate was contrary to Juror No. 3's own statement that she could focus on the evidence and remain objective and unbiased.

A. *Background*

The jury commenced deliberations shortly after 1:30 p.m. on July 3, 2013. After the jurors reassembled on July 5, 2013 to resume deliberations, the bailiff reported that Juror No. 3 had informed him of an encounter she had had with codefendant Moore and wanted to discuss with the court before continuing deliberations because she was uncomfortable. The court had Juror No. 3 brought into the courtroom. She explained to the court and attorneys that she was sitting on a bench waiting for her husband about a block away from the courthouse on July 3, when she became aware that codefendant Moore and others with him had passed by her. She said, "We just nodded because I was trying very much, just as you have incidental contact, not to, you know, make any meaningful contact with each other, as you said." She explained that suddenly, a homeless man who to her was obviously mentally ill and acting violent and angry was "in her face" and demanding her soft drink. She fell backwards a bit while the homeless man was insisting and she was trying to push away.

Juror No. 3 said, "And then suddenly Mr. Moore was there sort of, um—he wasn't talking but he was saying—indicating should I help you? Can I—and I was thinking, no, I can't have contact with you, either. So I was kind of going to both of them, 'No, no, no.'

4

And then Mr. Moore said—you know, like he was very willing, can I step in, I'll-take-care-of-it kind of thing. I was going, 'No, no. It's okay.' But I was feeling very frightened at that point. This is not okay. And here I am and all this is going on. And so then I said, 'No. Go.' [¶] And so then he started, you know, backing up with his people. And I just, um, got the—a person—I think he just grabbed my shoulder or something and I went around and stood kind of in the corner of the street. And then the homeless person just sat down. And I didn't even look back to see where Mr. Moore went. [¶] So I thought I just got to push this out of my mind. Then I woke up at two in the morning thinking about it, you know, out of a sleep. I was thinking about it in that—his actions. And I thought I was influenced in both ways. So I thought, well, is that a balance? One, he saw somebody in trouble and he was willing to just jump in instinctively. But, on the other hand, you know, you've got to control yourself in those situations too. [¶] So I've been tossed back and forth in an additional way. So I thought I should at least have brought it up thinking Mr. Moore may have brought it up to his attorney too and explain the circumstances of what happened."

The court asked Juror No. 3 whether she had relayed what had happened to other jurors. She responded that in the jury room she said she felt a responsibility to talk to the judge, and when other jurors asked why, she said she had an encounter with codefendant Moore; that "there was a homeless person and Mr. Moore was there." She did not explain further, and they asked her whether she felt more favorable toward him, but that she better not say whether she did or did not.

5

The court asked Juror No. 3 if she thought what had happened affected her ability "one way or the other, favorable towards him or not favorable?" She responded: "Well, I would say my initial response, ah—well, it was fear in the moment a little bit. . . . And then by trying to push away and say this doesn't matter, um, I knew I had a favorable response because it was, um, you know, of all the people walking by, he was the only one that wanted to assist. And just all of a sudden blossomed. [¶] But then since then, like I woke in the morning. I've gone back and forth. [¶] I think I can—there's two ways of looking at that action. And I think that I can go forward okay. I'm asking myself, obviously over and over and over, can you—and I believe I can. As I'm talking to you now, I believe I can. There's a balance in saying he wanted to assist and, ah, his instincts, some of these things, and that can go both ways in his life. And I think I can just take it into account."

The court told Juror No. 3 that she should not think about the situation, and asked whether she could put it out of her mind totally; not consider it at all. She responded: "Ah, to this point I've not been able to. Now that we've had this discussion, um, yes, I believe I could. It's been—you know, you can imagine, it just keeps—when you try to push it away and it keeps popping up over the last couple of days. But now there's been some distance and, ah—I feel very frustrated that the incident would have happened at all. And, um—so, yes, I think that I can just say, 'Okay. Then I'll put that aside and go back to just looking at what the evidence is.' "

6

The court instructed Juror No. 3 not to discuss the matter with the other jurors, and after she left the courtroom, the prosecutor asked that she be dismissed. The prosecutor pointed out that Juror No. 3 had been thinking about the situation for over a 24-hour period, and it woke her up in the middle of the night. The court was impressed by Juror No. 3's initial reaction that she could not set the matter aside. It said: "I kind of had the feeling that she—the answer she ultimately gave is what she sort of wanted—thought the Court wanted to hear. I think her initial sort of unguarded reaction was that she didn't think she could set it aside." Codefendant Moore's counsel pressed the court to leave Juror No. 3 on the jury, pointing out that her trauma was caused by the confrontation with the homeless person. The court agreed that the main source of Juror No. 3's discomfort came from the homeless person, but it noted Juror No. 3 stated she was impressed that codefendant Moore was the only one who seemed to show any interest or concern; that he was ready and willing to rescue her. Alvarado's counsel's then remarked that Juror No. 3's honesty about the matter made her a thoughtful and considerate juror who would not present bias.

Ultimately, the court excused Juror No. 3 over defense counsel's objection.[1] It acknowledged Juror No. 3 had eventually stated she could put the situation behind her,

---

[1] At the end of the discussion concerning Juror No. 3, codefendant Moore's counsel stated: "So the objection's noted for the record, your Honor?" The court responded, "Yes. I'm excusing her over your objection." Since it is reasonably clear that both defense counsel were against Juror No. 3's dismissal and expressed their view, we decline to hold that Alvarado's counsel forfeited the claim for appellate review, as the People argue.

7

but based on what she initially said and also "her manner and demeanor, her nonverbal communication, her body language, if you will," the court found it "pretty clear" that she was not sure that she could set it aside, and "somebody reading this record wouldn't have the benefit of having seen her as we did." The court also reasoned that in the context of this case, "if this case involved some different circumstances, I might feel differently, too. But there's enough similarity I think that there might be some spillover here."

B. *Legal Principles*

The law permits the trial court to discharge a juror at any time, including during deliberations, based on a showing of "good cause" that the juror is "unable to perform his or her duty." (Pen. Code, § 1089; see *People v. Wilson* (2008) 43 Cal.4th 1, 25.) " ' "Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 898; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.)

"While removal of a juror is committed to the discretion of the trial court, upon review, the juror's disqualification must appear on the record as a demonstrable reality. 'The demonstrable reality test entails a more comprehensive and less deferential review' than substantial evidence review. 'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias [or other good cause for removal] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's

8

conclusion is manifestly supported by evidence on which the court actually relied.' " (*People v. Homick*, *supra*, 55 Cal.4th at p. 899; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 712; *People v. Wilson* (2008) 44 Cal.4th 758, 821 [a juror's inability to perform as a juror "requires a 'stronger evidentiary showing than mere substantial evidence' "].)  In assessing the trial court's ruling, the reviewing court must "consider not just the evidence itself, but also the record of reasons the [trial] court provides."  (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1053.)

C.  *Analysis*

Alvarado contends the record does not show to a demonstrable reality that Juror No. 3 was unable to perform her duty as a juror.  He maintains the court's first error was that it used the wrong standard; that the court's conclusion that it was "pretty clear" to it that Juror No. 3 was impacted by the event did not rise to the level of demonstrable reality.  Alvarado apparently maintains that because Juror No. 3 eventually stated she could be objective, there was no substantial evidence to support her excusal.  Alvarado further contends that the court's second error was that it failed to properly analyze whether there was an actual legal basis for the excusal, pointing out Juror No. 3 was not a hold out, and she did not fail to follow instructions or intentionally receive extraneous material.  Though Alvarado concedes misconduct occurs when a juror inadvertently receives potentially prejudicial information from a source other than the courtroom, he points out that not every instance requires reversal; that prejudice is established only if, objectively, the material was "inherently and substantially likely to have influenced the juror."  (See *In re Carpenter* (1995) 9 Cal.4th 634, 653.)  According to Alvarado, the

9

court's conclusion that Juror No. 3 could not set aside her encounter with codefendant Moore was "totally contrary to the actual evidence."

We cannot agree with Alvarado's contentions. Plainly, a juror's unauthorized contact with a defendant is improper. (Accord, *People v. Cowan* (2010) 50 Cal.4th 401, 507 [a juror's unauthorized contact with a witness is improper]; *People v. Hardy* (1992) 2 Cal.4th 86, 175 [same].) Likewise, a juror's receipt of information about a party outside the court proceedings, even if passive or involuntary, is considered misconduct and raises a presumption of prejudice. (*People v. Cowan*, at p. 507; see *People v. Nesler* (1997) 16 Cal.4th 561, 579.) It is true that improper contact with a juror "may be nonprejudicial if the contact was 'de minimis' [citation] or if there is no showing that the contact related to the trial." (*Cowan*, at p. 507.) But neither is the case here.

Under the circumstances, Juror No. 3's encounter with codefendant Moore was not de minimis. (Compare, *People v. Hardy*, *supra*, 2 Cal.4th at p. 175 [juror's gift of dessert to witness was de minimis where there was no personal contact between the juror and witness, and no evidence the juror spoke to the witness or that the gift was from the juror].) Juror No. 3 admitted to the court that the encounter—which Alvarado rightly concedes was unusual and had an obvious impact upon her—left her with conflicting feelings: favoring Moore on the one hand because "he was the only one that wanted to assist" her, and against him on the other because he could not "control [him]self" in the situation. During the incident, Juror No. 3 received information about Moore in the sense that she learned he was willing to step into a threatening situation to protect someone, which was the very defense presented, at least on Alvarado's behalf, at trial. That the

10

incident weighed heavily on Juror No. 3 was apparent both from her comments and her nonverbal behavior, which the court expressly noted in its ruling. The court also relied on the similarities between the situation involving Juror No. 3 and that presented in the case at hand. We believe these factors pointed to Juror No. 3's bias or inability to impartially evaluate the evidence to a demonstrable reality. Alvarado's argument that the trial court did not apply the demonstrable reality standard is meritless; it is for the *reviewing court* to determine whether the trial court's finding is manifestly supported by evidence on which it actually relied, such that the juror's inability to perform her duty appears in the record as a demonstrable reality. Nothing in the record suggests the trial court applied an improper legal standard.

Juror bias from receipt of out-of-court information "may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against [or in favor of] the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard." (*People v. Nesler*, *supra*, 16 Cal.4th at pp. 578-579.) " 'A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 589.)

11

Here, the trial court did not abuse its discretion in concluding that, as a result of her encounter with codefendant Moore, there was a substantial likelihood that Juror No. 3 suffered from actual bias or prejudice. Though the contact was inadvertent at least on the part of Juror No. 3, it was not minimal and it had some relation to the case because it showed Moore's proclivity to come to the defense of someone in need of assistance, supporting the testimony of the defense witness as to both Moore's and Alvarado's actions on the morning in question. Thus, we cannot say the contact had nothing to do with the case. The encounter and Juror No. 3's reaction to it supports a conclusion that there is a substantial likelihood Juror No. 3 was prejudiced by it.

Our conclusion does not change by the fact Juror No. 3 eventually said she thought she could "put [the incident] aside and go back to just looking at what the evidence is . . . ." As the People point out, "a juror need not admit a bias for the court to find that it exists." (*People v. Lomax*, *supra*, 49 Cal.4th at p. 590.) "[T]rial courts are frequently confronted with conflicting evidence on the question whether a deliberating juror has exhibited a disqualifying bias. [Citation.] 'Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it.' [Citation.] In such circumstances, the trial court must weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings. We defer to factual determinations based on these assessments." (*Ibid*.) Here, the conflict came by way of Juror No. 3's verbal and nonverbal responses to the court's inquiry. We will not reweigh the court's credibility determination or its assessment based upon its own observation of Juror No. 3.

12

" 'The substitution of a juror for good cause pursuant to [Penal Code] section 1089, even after deliberations have commenced, " 'does not offend constitutional proscriptions.' " ' " (*People v. Lomax*, *supra*, 49 Cal.4th at pp. 591-592.)  As we have concluded the trial court's finding of good cause to dismiss Juror No. 3 is supported to a demonstrable reality, there was no abuse of discretion and her discharge did not violate Alvarado's statutory or constitutional rights.  (*Ibid.*; see also *People v. Fuiava*, *supra*, 53 Cal.4th at p. 716.)

## II. *Alvarado's Post-Conviction Motions*

A. *Background*

Following his conviction, Alvarado filed two handwritten motions that he signed but his retained counsel did not.  In the first motion, Alvarado sought an order striking the prior serious felony conviction alleged in the accusatory pleading on grounds it was a misdemeanor for all purposes under Penal Code section 17, subdivision (b)(1).  In a sworn declaration, Alvarado stated that at the time he admitted his prior conviction, he did not understand it was a misdemeanor for all purposes, he was not asked about and did not waive his right against self-incrimination and to confront his accusers or present defenses to the prior conviction allegations.  He stated he was not informed about the increase in the term of imprisonment imposed upon his admission of the prior conviction. He stated his waiver of trial rights and admission was not knowing, intelligent and voluntary.

In the second motion, Alvarado repeated his claim that his admission to his prior felony conviction was not constitutionally valid in that he was not advised by the court or

13

anyone else of his rights and did not freely, voluntarily and intelligently waive the right to counsel, and other constitutional rights as required by *In re Yurko* (1974) 10 Cal.3d 837. He sought an order reversing the true findings on his prior conviction allegations and asked he be allowed to withdraw his admissions with the court's consent.

The trial court first addressed the motions on August 14, 2013, observing counsel had not signed them. It asked Alvarado's retained counsel whether he intended to argue them or join in the motions, and defense counsel stated that because Alvarado had contended he had not been properly advised, he told Alvarado he could not represent him and Alvarado should retain different counsel or represent himself. The court expressed doubt that Alvarado's first motion had merit; it stated Alvarado's conviction did not become a misdemeanor by operation of law by the fact he was ordered to serve 365 days in local custody as a condition to a grant of formal probation.[2] Counsel then discussed the matter with Alvarado, and explained to the court that Alvarado did not understand the distinction between an imposition of sentence being suspended and did not believe his

---

[2]    In part, the court said: "I have the change of plea form in front of me. I mean, for several reasons obviously he would not be on formal probation by that misdemeanor to begin with. But even more fundamentally than that I have a copy of the change of plea form which he signed at the time he entered that plea. It's abundant to anybody reading that it's that the [stipulation to 365 days in local custody] was a condition of grant of formal probation. Under the law that does not make it a misdemeanor. . . . It's abundantly clear from the form that we are talking about a felony. It talks about the maximum of nine years, it's a serious violent felony strike, which is circled and initialed. It's priorable, which would increase punishment for future offenses. It's a prison prior. [¶] So it's apparent to me that everybody, and I'm confident including Mr. Alvarado, understood."

14

conviction qualified as a strike because he was sentenced to county jail. Counsel stated Alvarado would not have entered into his plea if he had known.[3]

As for Alvarado's second motion and whether Alvarado understood the consequences of his plea, the court offered to order a transcript of the hearing. Alvarado's counsel told the court it was up to the court to decide to do that. The court informed counsel that it was not going to relieve him and appoint different counsel because it did not think there was a viable basis for doing so. In further discussion, the court acknowledged they "won't be able to resolve it today" but that it was "willing to give [Mr. Alvarado] every opportunity to be heard on the matter . . . ." Defense counsel asked to be heard, and stated, "I want my client to make the call since it's ultimately up to him." The court responded: "Well, if he really—I don't want to abandon his position. If his position is that he was twice not properly advised, he was not properly advised when he entered the initial plea and he was not properly advised when he made his admission here, then I don't—I mean, he's taking—he's invested the time and effort in making these motions, so I don't want to dismiss it offhand. I just don't think we'll be able to resolve it

---

3       Counsel stated: "Well, I just spoke to my client on that provisional issue. I think he did not understand the distinction between an imposition of sentence being suspended and what he actually went to. I think his understanding when he entered the plea was that because he was going to county jail that—[¶] The Court: That made it a misdemeanor. [¶] [Defense counsel]: Right. And a strict reading of [Penal Code section] 17[, subdivision (b)] without knowing the—how other laws, you know, counteract with that, specifically the nature of suspending a sentence, imposition of sentence, that he did not believe that it would ever qualify as a strike. I think the argument he's making is based on that prior case when he entered that prior plea that he had no idea that it would be priorable because of his lack of understanding. . . . [¶] Is that fair? [¶] Or he would never accept it. He just wanted that to be known."

15

at this point. [¶] Do you understand that, [Mr. Alvarado]?" Alvarado stated, "Yeah, now I—" The court then stated, "I will get the transcript if need be, we will get those to the attorneys that were here involved." It explained to Alvarado that if he was going to argue that his counsel provided ineffective assistance, he would have to waive his attorney/client privilege: "But, you know, the first step would be to get a transcript. And maybe after you look at the transcript you will decide your recollection was faulty, and in fact you were given these. I mean, that was three or four, at least couple years ago . . . ."

Ultimately, as to Alvarado's motion concerning the misdemeanor status of his prior offense, the court remarked it was "abundantly clear" it was not a misdemeanor, and stated, "I will deny that motion now because that's just not the state of the law" but it set the matter for hearing on the "legal effect . . . at this point of your prior." The court emphasized again that it was not going to penalize Alvarado for raising the issues, and that he had a right to raise them though it did not believe he would prevail. As the court was setting the matter, Alvarado's counsel made an oral motion to withdraw, stating, "I believe [Alvarado's] going to proceed as pro per." The court asked counsel if Alvarado wanted to represent himself. Counsel responded: "I'm just saying that *I don't know if that's what he wants to do*, but I can't represent him on these motions because I do believe that collaterally they involve me." (Italics added.) The court denied counsel's request to withdraw without prejudice to counsel's right to renew the motion on receipt of the transcript. The court stated it did not think there was merit to Alvarado's second motion and was "confident that I made a thorough record in taking [Alvarado's] waiver and his admission of that prior. I don't think there could be any grounds for asserting that you

16

provided ineffective assistance of counsel, so I'm not going to let you withdraw.  If I think there is, then I will reconsider the matter, but I will be very surprised."  On the court's inquiry, the prosecutor confirmed her view that the court "made a very thorough record."  The court indicated it would set the matter out about 30 days so as to obtain the transcripts of the relevant hearings.

The court then asked counsel whether Alvarado had any documented mental health history to present at the time of pronouncement of judgment, and counsel referred the court to Alvarado to answer that question.  Alvarado mentioned he had been diagnosed the prior year for "PTSD" by a jail psychiatrist, and was taking medication.  The court interrupted Alvarado and advised him it would take such matters under consideration, and that his counsel could explain the consequences of raising such issues.  At that point, Alvarado made the following request:

"[Alvarado]:  Your Honor?

"The Court:  Yes?

"[Alvarado]:  But I would like to request—be able to request a public defender for that.

"The Court:  Why should I relieve Mr. Prepas [retained counsel]?  I don't know why he can't cover that.

"[Alvarado]:  He's actually well, he's my only counsel.  And I would feel better, more at ease with myself to return back to a public defender.

"The Court:  Your family retained him.  I don't see any basis for relieving him at this point.  That motion is denied, *again without prejudice . . . .*"  (Italics added.)

17

The court continued to acknowledge Alvarado's "rough start in life" and his prior record. It said, "Look, *we're not going to resolve this today*, Mr. Alvarado. You just need to understand if you really want to pursue that, there's some mental health challenges the court should take into account in sentencing and—I have some discretion here. I have to pick the term and you could make a motion to strike. I have everything mentioned about a motion to strike the strike . . . . I will hear that sort of motion, but—" (Italics added.) Alvarado's counsel asked to consult with his client, and related to the court that Alvarado wanted his mother, who had come from out of state, to address the court. Alvarado's mother made a statement, and advised the court she would return for Alvarado's sentencing hearing.

Alvarado's sentencing hearing took place on September 27, 2013. Alvarado's retained counsel announced he was present on Alvarado's behalf. The court began by again addressing Alvarado's motions, denying the first motion as without merit because Alvarado's crime was not a wobbler. As for Alvarado's second motion, the court stated it had obtained the transcript of Alvarado's hearing and had given it to Alvarado's counsel so that he could review it with Alvarado. According to the court, the transcript made it "crystal clear" that Alvarado had not been misled and was not misunderstood about the waiver of his constitutional rights. The court read from the transcript, which indicated Alvarado acknowledged he was pleading guilty to a serious and violent felony crime, that it was a strike offense, and that he would face "substantial additional penalties" and a mandatory state prison term if he committed any felony. It ruled that Alvarado effectively waived his right to a jury trial on his bifurcated prior conviction allegations

18

and admitted the truth of those allegations. The court observed during the sentencing hearing that the probation report indicated Alvarado had reported some mental health issues, but the court did not find documentary evidence before it to support Alvarado's statements. It asked Alvarado's counsel to address whether there was some legal cause why judgment should not be pronounced, and counsel responded, "No legal cause, your Honor."

B. *Contentions*

Relying on *People v. Ortiz* (1990) 51 Cal.3d 975, Alvarado contends that by denying his and his counsel's requests to be relieved and that a public defender be appointed, the trial court committed error that is reversible per se. He maintains, "The basis for relieving retained counsel was clear—the defendant requested it. Furthermore, it was clear that defense counsel had become a bystander to the entire proceedings, was not representing appellant in the hearing, and was not going to engage with the court." Alvarado argues that he "did not have to prove it, but there was a clear conflict that impacted counsel's representation."

Alvarado additionally contends that while he did not make a motion to represent himself, the court placed him in a position of de facto self representation when his counsel refused to litigate on his behalf and thus erred by failing to take a complete and adequate waiver of counsel or allow him to have counsel who would represent him during the proceedings. Alvarado argues the circumstances were insufficient to establish his knowing and intelligent waiver of his right to counsel, and he was effectively left without counsel during the initial hearing on his motions as well as during the outset of

19

his sentencing hearing when the court ruled on them. According to Alvarado, the complete deprivation of assistance of counsel during critical stages of the proceeding raises an "irrefutable presumption of prejudice" relieving him from showing a probable effect on the outcome.

The People respond that Alvarado did not make a clear and unequivocal request to discharge his retained counsel, and that the constitutional protections raised by Alvarado do not apply to *counsel*'s motion to withdraw. Thus, they argue, Alvarado's reliance on *People v. Ortiz, supra*, 51 Cal.3d. 975 is misplaced, and the case is distinguishable in any event because Alvarado made no showing of indigence as in that case. The People assert that Alvarado does not identify with record evidence any conflict of interest, nor did he point out any such conflict to the trial court. They further argue Alvarado never asked to represent himself, eliminating any duty of the court to conduct a *Faretta* hearing, and he was represented by counsel throughout the proceedings. According to the People, under the totality of the circumstances, the trial court did not err; it conducted a lengthy inquiry into the validity of Alvarado's admission to his prior felony convictions, reviewed the transcripts and found no legal basis to permit Alvarado to withdraw his plea, and employed caution in handling Alvarado's motions and the claims he raised.

C. *Analysis*

The Sixth Amendment right to counsel entitles both nonindigent defendants and indigent defendants to discharge retained counsel. (*People v. Ortiz, supra*, 51 Cal.3d at pp. 982-987; *People v. Munoz* (2006) 138 Cal.App.4th 860, 866; see *People v. Verdugo* (2010) 50 Cal.4th 263, 310-311.) A defendant seeking to discharge retained counsel need

20

not demonstrate his attorney is providing inadequate representation or that he and his attorney are embroiled in irreconcilable conflict. (*Munoz*, at p. 866.) "The right to discharge a retained attorney is, however, not absolute. [Citation.] The trial court has discretion to 'deny such a motion if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice" [citations].' " (*Verdugo*, at p. 311, quoting *Ortiz*, at p. 983.) The trial court has discretion to deny the motion if the defendant " 'arbitrarily desires to substitute counsel at the time of trial.' " (*People v. Lara* (2001) 86 Cal.App.4th 139, 153.) The Sixth Amendment also guarantees the defendant a right of self-representation, but to exercise that right, a defendant must make an unequivocal and timely demand, and his waiver of the right to counsel must be voluntary, knowing, and intelligent. (*People v. Boyce* (2014) 59 Cal.4th 672, 702; *People v. Elliott* (2012) 53 Cal.4th 535, 592.) In *Ortiz*, the court held a trial court erred by denying an indigent defendant's timely request to discharge retained counsel because the defendant had not shown the attorney to be incompetent: "[W]hen an indigent criminal defendant is forced to proceed with a retained attorney whom he has consistently, and in a timely manner, sought to discharge in favor of the public defender or other court-appointed counsel," prejudice is presumed. (*Ortiz*, 51 Cal.2d at p. 988.)

As a threshold matter, we agree with the People that Alvarado did not in fact invoke his Sixth Amendment right to discharge his retained counsel at the August 2013 hearing. Rather, Alvarado's counsel made his own request to withdraw because he perceived Alvarado advancing some claim of ineffective assistance in connection with

21

the postconviction motions. Even after making his request, counsel nevertheless proceeded to counsel Alvarado concerning the felony or misdemeanor nature of his prior conviction and Alvarado's mistaken beliefs in that respect. Later in the hearing when the court was addressing whether Alvarado intended to raise mental health issues for purposes of sentencing, Alvarado asked the court if he could request a public defender "*for that*," i.e., the issues concerning his possible PTSD and mental health history. Though the trial court perceived that as a request to discharge his retained attorney, we do not see Alvarado's inquiry as such a clear request, but rather as one for appointment of an *additional* attorney to present arguments and evidence concerning Alvarado's mental health.

In any event, the trial court denied both counsel's motion to withdraw, and Alvarado's request for a public defender, *without prejudice* for either of them to renew those motions upon receipt of the transcripts of Alvarado's hearings related to his prior conviction. Neither counsel nor Alvarado renewed their requests at the sentencing hearing, at which the court acknowledged giving the transcripts to counsel to review them with Alvarado. There is no further suggestion at that sentencing hearing that counsel still wished to withdraw, or that Alvarado sought different or additional counsel. Under these circumstances, Alvarado has not demonstrated that the principles expressed in *People v. Ortiz*, *supra*, 51 Cal.3d 975, pertaining to a defendant's right to discharge his retained counsel, apply. Alvarado abandoned any right to discharge his retained counsel when he failed to renew his request at his sentencing hearing.

22

Nor can we conclude on this record that Alvarado was forced to effectively proceed without assistance of counsel during the initial August 2013 hearing on the postconviction motions, his sentencing hearing, or at any other "critical stage" of his proceeding. (*People v. Bryant* (2014) 60 Cal.4th 335, 465 ["critical stage is one 'in which the substantial rights of a defendant are at stake' [citation], and 'the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial' "].) As indicated, the trial court repeatedly made clear during the August 2013 hearing that it could not entertain Alvarado's postconviction motions absent the transcripts of the relevant hearings, and so it postponed ruling on the motions until Alvarado's sentencing hearing. And, it was apparent at various times during the August 2013 hearing, and also at all times during Alvarado's sentencing hearing, that counsel was representing Alvarado and giving him advice.[4] Though the court initially purported to make a narrow ruling on the misdemeanor status of Alvarado's prior conviction, it nevertheless again considered and ruled on that aspect of the motion at Alvarado's sentencing hearing with Alvarado's retained counsel present on his behalf, after the court, counsel and parties had received and reviewed the transcripts. Alvarado does not contend that the court's ruling on that issue was incorrect, or that he was otherwise prejudiced by any of the court's rulings on his underlying motions. Counsel acted on Alvarado's behalf and explained matters to

---

[4]     Thus, if any denial of counsel occurred, it was for only a discrete time or hearing, in which case the rule of automatic reversal is inappropriate. (*People v. Lightsey* (2012) 54 Cal.4th 668, 700 [addressing a capital case].) "In such circumstances, the denial of the right to counsel, even during a critical stage . . . , does not require automatic reversal but is instead subject to harmless error review." (*Ibid.*)

Alvarado during the sentencing hearing, and there is no indication retained counsel did not adequately represent Alvarado at that time. The trial court had no basis to hold a *Faretta* hearing or operate under an assumption counsel was not acting on Alvarado's behalf during his sentencing.

Nor has Alvarado shown he was represented by conflicted counsel. The right to conflict-free counsel applies even where counsel is retained. (See *Cuyler v. Sullivan* (1980) 446 U.S. 335, 343-345; *People v. Bonin* (1989) 47 Cal.3d 808, 833-834; *Aceves v. Superior Court* (1996) 51 Cal.App.4th 584, 590.) To succeed on a claim that he was denied his right to conflict-free counsel, however, Alvarado "must show the existence of an actual or potential conflict 'that adversely affected counsel's performance.' " (*People v. Clark* (2011) 52 Cal.4th 856, 976; *People v. Lawley* (2002) 27 Cal.4th 102, 146.) When the court ascertains a potential conflict of interest, it must inquire, but "upon inquiring, [it] may decline to relieve counsel if it determines the risk of a conflict is too remote." (*Bonin*, at pp. 836-837; *Lawley*, at p. 146.) A trial court's decision to disqualify an attorney for a conflict of interest is subject to review for an abuse of discretion (*People v. Suff* (2014) 58 Cal.4th 1013, 1038), and its decision to *not* remove counsel is subject to the same standard. (See *People v. Brown* (1988) 203 Cal.App.3d 1335, 1340 [determination whether to grant or deny a motion to withdraw as counsel lies within the trial court's sound discretion].) A trial court is not required to " 'rubber stamp' counsel's request to withdraw." (*Aceves*, at p. 592.)

Here, Alvarado has not shown the court abused its discretion in its inquiry into the circumstances (i.e., obtaining the hearing transcripts of Alvarado's plea and prior

24

conviction admission) or by concluding based on its knowledge of the law and recollection of the prior hearing that Alvarado's counsel was not faced with a legitimate claim of ineffective assistance, or that he thereby operated under a conflict of interest. Alvarado has provided us no basis to overturn its finding. (Cf. *People v. Verdugo*, *supra*, 50 Cal.4th at p. 311 [court acted well within its discretion in denying defendant's motion to relieve his retained counsel where defendant did not identify any "specific conflict of interest between him and [counsel]" and at the time the motion was made the parties were embroiled in a hearing on a new trial motion, thus the court could reasonably justify denial on grounds the circumstances constituted " ' "disruption of the orderly processes of justice" ' "].) But more fatally, because Alvarado erroneously premises his appellate claims on his assertion he suffered the "complete deprivation of assistance of counsel," Alvarado has not undertaken to establish that the court's refusal to replace his retained counsel due to counsel's perceived conflict altered the outcome of his sentencing hearing. "Accordingly, '[Alvarado] has not shown a reasonable probability [citation] or possibility' " (*People v. Suff*, *supra*, 58 Cal.4th at p. 1039) that the court would have sentenced him differently had he been represented by a public defender.

Setting all of these deficiencies aside, even if we were to apply on the principles expressed in *People v. Ortiz*, *supra*, 51 Cal.3d 975, we would conclude given the extreme lateness of Alvarado's request for counsel and its inadequate basis (that he would "feel better, more at ease with [him]self" with a public defender), the court had ample reason to conclude any substitution would be untimely and disrupt the orderly and expeditious administration of justice, even with the sentencing hearing set a month away.

25

### III. *Correction of Abstract of Judgment*

Alvarado contends, and the People concede, that we should order the abstract of judgment corrected to reflect that Alvarado has 293 (instead of 291) days of actual custody credit as he was arrested on December 9, 2012, rather than on December 11, 2012, which was the arrest date reported by the probation officer. We agree the abstract of judgment should reflect 293 days of actual custody credit. The failure to properly calculate custody and conduct credit is a jurisdictional error that can be corrected at any time. (*People v. Chilelli* (2014) 225 Cal.App.4th 581, 591.) We modify the judgment and order the abstract of judgment corrected.

DISPOSITION

The judgment is modified to reflect an award of 336 days of presentence conduct credit, comprised of 293 actual custody days and 43 days of conduct credit. The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.


O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.